STATE of Missouri, Respondent,

v.

Thomas William HENDRIX, Appellant.

No. WD 48407.

Missouri Court of Appeals,
Western District.

July 12, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 1994.

Application to Transfer Denied
Oct. 25, 1994.

Richard E. McFadin, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P.J., and FENNER and HANNA, JJ.

FENNER, Judge.

Appellant, Thomas Hendrix, appeals his conviction in the Circuit Court of Chariton County, Missouri, of one count of sodomy, in violation of section 566.060, RSMo Supp.1993, and two counts of sexual abuse in the first

degree, in violation of section 566.100, RSMo Supp.1993.[1]

The record reflects that Lila Willit babysat A.S. and H.Y., among other children, at her home in Huntsville, Missouri. Hendrix began dating Ms. Willit around September of 1988 and moved in with her in November of 1988. Hendrix lived in Ms. Willit's house until sometime in 1990. During the time that Hendrix lived with Ms. Willit, Ms. Willit babysat A.S. and H.Y., among other children, at her home. The allegations in the case at bar concern acts of sodomy and sexual abuse perpetrated by Hendrix on A.S. and H.Y. while they were at Ms. Willit's home.

Appellant was charged by information, filed on November 19, 1991, with two counts of sodomy and two counts of sexual abuse in the first degree. In Count I, appellant was charged with the felony of sodomy, in that between June, 1988 and December 24, 1989, appellant had deviate sexual intercourse with A.S., to whom appellant was not married, and who was less than fourteen years old, by touching her vagina with his finger or hand in a bathroom at Lila Willit's residence. In Count II, appellant was charged with the felony of sodomy in that between June, 1988 and December 24, 1989, appellant had deviate sexual intercourse with A.S. "by inserting his finger into her vagina during a birthday party at [Ms. Willit's] residence." In Count III, appellant was charged with the felony of sexual abuse in the first degree, in that between June, 1988 and December 24, 1989, appellant subjected A.S., a person less than twelve years old, to sexual contact by touching her legs with his genitalia. In Count IV, appellant was charged with the felony of sexual abuse in the first degree in that on or about May 15, 1990, appellant subjected H.Y., a person less than twelve years old, to sexual contact.

A jury trial took place on June 21st, 22nd, and 23rd of 1993. The jury returned its verdict on June 23, 1993, finding appellant guilty of one count of sodomy (Count I) and two counts of sexual abuse in the first degree (Counts III and IV). Count II, the other sodomy count, was apparently dismissed. The jury recommended a sentence of fifteen

1. All statutory references are to RSMo Supp. 1993 unless otherwise noted.

years imprisonment on the sodomy count and five years imprisonment on each sexual abuse count.

On July 16, 1993, appellant filed a Motion for New Trial, arguing, in part, that the trial court committed prejudicial error in allowing the State to endorse Dr. Douglas Beil as an expert witness on June 21, 1993, and in overruling appellant's motion for a directed verdict for the insufficiency of evidence to make a submissible case as to all of the counts. The court denied appellant's Motion for New Trial.

Judgment was entered on September 9, 1993, and appellant was sentenced to fifteen years on the sodomy count (Count I) and five years each on the sexual abuse counts (Counts III and IV). The sentences were to run concurrently on Counts III and IV, and consecutive with Count I, for a total of twenty years imprisonment on all counts.

This appeal followed.

■ In his first point on appeal, appellant argues that the trial court erred in granting leave to respondent to endorse Dr. Douglas Beil as an expert witness on the date of trial. Appellant contends that the trial court further erred in overruling appellant's request for a mistrial upon completion of Dr. Beil's testimony because (1) the late endorsement of Dr. Beil violated Rule 23.01, (2) the late endorsement of Dr. Beil along with the failure to provide any type of medical report to appellant denied appellant the ability to confront the witness adequately or to cross-examine the witness properly, (3) Dr. Beil's testimony improperly invaded the province of the jury as to the ultimate issue of fact, and (4) improper foundation was laid for Dr. Beil's testimony because Dr. Beil's opinion was based on medical reports of the treating physicians and insufficient foundation was laid for the admission of these reports.

Rule 23.01(f) provides as follows:

The names and addresses of all material witnesses for the prosecution except rebuttal witnesses and witnesses who will appear upon the trial for the production or identification of public records shall be listed [on the indictment or information]. Additional witnesses may be listed at any time after notice to the defendant upon order of the court.

■ We initially note that the admission of expert testimony is within the sound discretion of the trial court, and the trial court abuses that discretion only when its ruling is clearly against the logic of the circumstances or is arbitrary and unreasonable. *State v. Williams*, 828 S.W.2d 894, 899 (Mo.App. 1992). The trial court has broad discretion in permitting late endorsement of witnesses. *State v. Lopez*, 836 S.W.2d 28, 32 (Mo.App. 1992). Among the factors we consider in determining whether the trial court abused its discretion in allowing a late endorsement of a witness are: (1) whether defendant waived the objection; (2) whether the State intended to surprise defendant or acted deceptively or in bad faith with an intent to disadvantage defendant; (3) whether defendant was surprised and suffered any disadvantage; and (4) whether the type of testimony given might readily have been contemplated. *State v. Shaw*, 839 S.W.2d 30, 36 (Mo.App.1992).

Appellant's first claim is that the late endorsement of Dr. Beil violated Rule 23.01(f) in that appellant was not given proper notice that Dr. Beil would be testifying and, thus, appellant was deprived of the opportunity to confront and cross-examine Dr. Beil properly. The record refutes appellant's claim in this regard.

On June 21, 1993, the first day of trial, the State filed a motion to endorse Dr. Beil as a witness. Appellant, on that same day, filed an opposition to this endorsement. At trial, just prior to Dr. Beil's testimony, defense counsel renewed his objection to Dr. Beil's testimony. Defense counsel argued that the State "only endorsed the witness until some time about a week ago, possibly. As far as being actually endorsed by the Court, was endorsed as of Monday morning [June 21, 1993]." In response, the prosecutor stated that "the State recalls directly giving this information to [one of appellant's co-counsel] Curtis Crawford some weeks prior to trial and, in fact, the State also recalls discussing with defense counsel here that we would have to seek out another physician because of the unavailability of Dr. Vetney who

moved his practice to a different state." The prosecutor further stated:

As soon as the State determined which doctor would be testifying in this case, I went to great pains to try to notify Mr. Gilmore [defense counsel] whose phone numbers kept changing and eventually located Curtis Crawford's [Mr. Gilmore's co-counsel] number since he was also an attorney of record and gave him the name and the address of the doctor in this case who will be testifying. I explained the basis of the testimony that I hoped he would testify to.

I explained that I was providing him with all the medical records and the reports that I had. I offered available dates for a deposition of the doctor at least two weeks prior to trial and at no time did I receive any contact from either of defense counsel, either, even though we discussed other matters that they were interested in deposing the witness.

Furthermore, on Friday and Saturday of this last week I talked to defense counsel on a couple of occasions and apparently at least on one occasion after they had learned that this doctor was testifying had finally interviewed him. At no time did they indicate to me Friday evening or Saturday that it was a problem that they now wished to depose him. Instead, they notified me Sunday evening around, I think, it was 3 to 5 p.m. . . . that they would have to object to his testifying. The State made every opportunity to provide them with everything the State had at that time. There is no report other than a curriculum vitae, and what they have heard over the telephone is essentially the same information that I have so the State and the defense are in the same position. The defense has had an opportunity to depose. A number of dates were made available and no effort was made to take advantage of those dates.

Curtis Crawford stated at trial that he did recall having a conversation with the prosecutor approximately a month prior to trial. Mr. Crawford testified as follows:

I did have conversation with [the prosecutor] some time, as I recall, approximately a month or so, about a month ago; and I don't—the nature of that conversation seems to me was dealing with a continuance date. That's my recollection at this time. The other aspect of it was the name of the doctor in the case. To my knowledge, and it's my recollection, that it came to my attention approximately one week ago to date, that's when I—first of my recollection is—tells me it was one week ago. We may have discussed something about a doctor or another witness; but the name of that doctor, to me—to my mind was just about one week ago when I brought it to the attention of Mr. Gilmore, my partner, co-counsel in this case, last Wednesday, I believe it was.... That's my recollection. My first recollection being of the doctor was last week possibly and probably was conversations about a doctor being endorsed; but who the doctor was, I can't say.

Mr. Crawford further stated that he thought the prosecutor mentioned something about depositions at least a month before trial. The following colloquy then occurred:

MR. FUSSELMAN [prosecutor]: Is it true that this is the only case we have going and that the only witness that we had a question about was a doctor to testify in lieu of Dr. Vetney? Would that be fair to say.

MR. CRAWFORD: Yes, it was a doctor; but no name was given.

MR. FUSSELMAN: Are you sure no name was given or you don't recall?

MR. CRAWFORD: I don't recall it.

MR. FUSSELMAN: Okay.

MR. GILMORE: No name was given to me, I can emphatically say that, before Thursday or Friday.

MR. FUSSELMAN: Mr. Crawford, do you also recall me commenting on the fact that I was having difficulty locating Mr. Gilmore because of changes in phone number and secretary and I called your name up because you were co-counsel in the day case?

MR. CRAWFORD: Yes, I recall that.

We find, based on the record before us, that the trial court did not err in allowing the

late endorsement of Dr. Beil. The record makes it apparent that the State acted in good faith and never intended to deceive or surprise appellant with the intent to disadvantage him. Co-counsel for appellant, Curtis Crawford, admitted that he was advised by the prosecutor that a different doctor would be testifying for the State approximately one month prior to trial and was given the opportunity to take depositions. The prosecutor stated that he provided Mr. Crawford with Dr. Beil's name and address at the time they first discussed that a new doctor would be testifying. Appellant had ample opportunity to prepare for Dr. Beil's testimony, and the trial court did not abuse its discretion in allowing the late endorsement of Dr. Beil.

■ Appellant also contends that Dr. Beil's testimony invaded the province of the jury when he testified to an ultimate issue in the case. In this regard, we note that an expert may testify as to his opinion on an ultimate issue in a criminal case, but the evidence must aid the jury and it must not invade the province of the jury. *State v. Cummings*, 714 S.W.2d 877, 885 (Mo.App. 1986). In *State v. Mackey*, 822 S.W.2d 933, 937 (Mo.App.1991), the defendant argued that the trial court plainly erred in allowing two experts in sexual abuse to testify as to their personal beliefs that the alleged victim suffered sexual abuse. The court denied the defendant's point, finding that the testimony of the two experts did not invade the province of the jury because it "did not point to the defendant being the perpetrator of the offense charged." *Id.* at 938.

In the case at bar, Dr. Beil, an academic pediatrician, testified that he specializes in child abuse and neglect and is a Sexual Abuse Forensic Expert, or SAFE doctor. He testified that in his opinion, based on a review of the medical reports of the two young girls, A.S. and H.Y. were victims of sexual abuse. In his testimony, Dr. Beil never pointed to appellant as being the perpetrator of the offenses charged. He merely testified that, in his opinion, there was both historical and physical evidence that A.S. and H.Y. suffered sexual abuse.

We find that Dr. Beil's testimony did not invade the province of the jury.

■ Appellant also claims that there was improper foundation laid for Dr. Beil's testimony which was based on medical reports of the treating physicians. An expert witness is entitled to rely on hearsay evidence to support his opinion so long as that evidence is of the type reasonably relied upon by other experts in that field; such evidence need not be independently admissible. *State v. Rowe*, 838 S.W.2d 103, 110 (Mo.App.1992).

At the State's request, Dr. Beil had examined reports from law enforcement and medical records relating to the investigations of alleged abuse of H.Y. and A.S. Dr. Beil testified that he read the documents "looking for both completeness from the perspective of being a SAFE certified physician and looking to see if there was any historical or physical evidence that would support the allegations that had been raised." Dr. Beil found that there was both historical and physical evidence to support the allegations.

Defense counsel objected to the foundation laid for the question about the physical findings of abuse. The court told the prosecutor to lay a better foundation. The colloquy went as follows:

Q [prosecutor]: There was some physical findings in the examination of an irritation or something. Can you comment on that?

A [Dr. Beil]: Yes, I can. Both girls actually had findings that were entirely confirmatory for the allegations that were presented.

MR. GILMORE: I'm going to object to this unless we can at least establish what he used to do this with. This is the purpose of the argument at the bench, the question, what documents were used in order to confirm any physical findings.

THE COURT: You're objecting to the foundation for this question?

MR. GILMORE: Yes.

THE COURT: Lay a better foundation, if you would.

Q: Did you review the medical records for [A.S.] and [H.Y.]?

A: Yes, I did.

Dr. Beil went on to comment about the physical findings in the two young girls based on his review of the documents given to him. After fairly extensive testimony about the physical findings in the two young girls, the prosecutor asked Dr. Beil, "Based upon your history, the examination, the history of these children, do you believe that A.S. was abused?" Defense counsel objected to this "as going to the ultimate issue in the case and asking an opinion," which objection was sustained. Counsel then approached the bench and the following colloquy occurred:

> MR. FUSSELMAN: He is prepared to give an opinion to a degree of medical certainty—to a reasonable degree of medical certainty based upon the history and the physical findings that each of these children were sexually abused. He's not to decide the ultimate fact which is whether this defendant molested the children but simply to give him the causative factors for the factors—for the conditions which he observed and the history of the children.
>
> MR. GILMORE: My objection still stands, Your Honor. I don't think he's had sufficient foundation.
>
> THE COURT: I'm going sustain [sic] the objection.

On cross-examination, the following colloquy occurred:

> Q [defense counsel]: But to give a specific type of opinion—
>
> A [Dr. Beil]: Uh-huh.
>
> Q: —on a specific child, isn't it true that the more information that would be provided to you the better your ability to give an opinion as to that specific child rather than a generalization about all children?
>
> A: I believe the documents that I had and reviewed were absolutely enough information because I reviewed essentially primarily the medical record, the doctor's examinations and histories to give me the ability to really sort of hone that down specifically for the girls.
>
> *   *   *   *   *   *
>
> A: It's such a striking finding on the examination [of A.S.] that that [exam] paragraph [in the medical record] by itself

really conclusively establishes that abuse occurred....

*   *   *   *   *   *

> Q: And then the report on [H.Y.] was a rather brief report, too, was it not?
>
> A: Yes, and hers was even more strikingly abnormal than [A.S.] was, if I could review that document for the record.

On redirect examination, the following colloquy occurred:

> Q [prosecutor]: Based upon your examination of the medical reports and the clear physical findings of these doctors, did you have any problem making a determination here today?
>
> A: Absolutely none. There is clear and striking historical evidence for both girls as well as physical evidence for both girls to really prove in my mind beyond a shadow of a doubt that they are victims of child molestation.
>
> MR. GILMORE: I'm going to object to this, Your Honor. Once again we ask the conclusion be kept out. I objected to it and sustained and against he's so eager to testify.
>
> THE COURT: I stated initially but I'm going to overrule it at this time since it's been developed what he bases his opinion on more fully.
>
> *   *   *   *   *   *
>
> Q: Have you reached an opinion after examining the physical findings with respect to [H.Y.] and [A.S.] and after examining the physical findings that were presented in the medical information, have you been able to form an opinion to a reasonable degree of medical certainty as to whether or not these two children have been sexually abused?
>
> A: Yes, I have.
>
> MR. GILMORE: Object to the form of the question, Your Honor.
>
> THE COURT: Overruled. You may answer.
>
> THE WITNESS: Yes, I have. Both girls are victims of sexual abuse.

Based on the record before us, we find that the trial court correctly found that there

was sufficient foundation laid for Dr. Beil's testimony. It was proper for Dr. Beil to base his opinion on the young girls' medical records as well as police reports.

Appellant's first point is denied.

In his second point on appeal, appellant argues that the trial court erred in overruling appellant's Motion for Judgment of Acquittal or, in the alternative, Motion for New Trial, because there was insufficient evidence as a matter of law upon which to convict appellant. Appellant contends that the record does not support the necessary elements of sodomy and sexual abuse with regard to H.Y. and A.S., and that "the record is devoid as to the essential element of the crime as charged," *i.e.*, touching for the purpose of arousing or gratifying the sexual desire of appellant. Appellant argues that the State improperly invaded the province of the jury to provide this necessary element to the crime charged during the State's questioning of Janice Hall, and that the court should have declared a mistrial.

■■■ In reviewing a challenge to the sufficiency of the evidence, our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). We accept as true all evidence favorable to the State, including all reasonable inferences drawn therefrom, and disregard all evidence and inferences to the contrary. *Id.* It is within the jury's province to believe all, some, or none of the witness' testimony in arriving at their verdict. *Id.*

In the case at bar, appellant was convicted of one count of sodomy and two counts of sexual abuse in the first degree. As to the sodomy count, section 566.060 provides, in relevant part, as follows:

3. A person commits the crime of sodomy if he has deviate sexual intercourse with another person to whom he is not married who is less than fourteen years old.

"Deviate sexual intercourse," as defined in section 566.010(1) means "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another per-

son." In the case at bar, the jury was instructed that it should find appellant guilty of sodomy (Count I) if it found that appellant touched A.S.'s vagina with his hand in a bathroom at Lila Willit's residence, that such contact constituted deviate sexual intercourse, as defined in the statute, that A.S. was less than fourteen years old, and that appellant was not then married to A.S.

■■ We find that the evidence sufficiently establishes appellant's guilt on the sodomy count (Count I). A.S., who was eight years old at the time of trial, testified, in relevant part, as follows:

Q: Could you go to the bathroom by yourself [at Lila's]?

A: Yeah.

Q: Did you ever need any help?

A: No.

Q: Did you ever ask Tom [appellant] for help?

A: No.

Q: Did Tom ever help you?

A: Yeah.

Q: Okay. Would you please tell the jury how Tom helped you?

A: He wiped me off.

Q: He wiped you off. Did you ask him to?

A: No.

Q: Can you tell the jury a little more about what—how it came to be that Tom was helping you in the bathroom that day?

A: He touched me between my legs and then he wiped me off with a towel.

Q: Do you remember if your pants were up or down?

A: Down.

A.S. indicated that Hendrix did not have toilet paper in his hand when he touched her between her legs. Rather, he rubbed her vaginal area with his hand. There is other evidence as well, as set forth in more detail below, indicating that appellant was not merely helping A.S. in the bathroom but was touching her in an inappropriate manner. We find that the record sufficiently establishes appellant's guilt on the sodomy count.

As to the sexual abuse counts, section 566.100 provides, in pertinent part, as follows:

1. A person commits the crime of sexual abuse in the first degree if:

\*    \*    \*    \*    \*    \*

(2) He subjects another person who is less than twelve years old to sexual contact.

According to section 566.010(2), "sexual contact" means "any touching of the genitals or anus of any person, or the breast of any female person, or any such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person." In *State v. Doolen*, 759 S.W.2d 383, 384–85 (Mo. App.1988), the court found that the young boy's testimony that appellant "rubbed his 'ding-dong' on the child's 'behind' and was 'rocking back and forth,'" was sufficient to establish that appellant deliberately rubbed his genitals against the young boy's anal area for the purpose of arousing or gratifying appellant's deviate sexual desires.

In the case at bar, appellant was found guilty of sexual abuse in the first degree for acts committed against A.S. and H.Y. As to A.S. (Count III), the jury was instructed that it should find appellant guilty of sexual abuse in the first degree if it found that appellant touched the legs of A.S. with his genitals with the purpose of arousing or gratifying his own sexual desire and that A.S. was then less than twelve years old, a fact which is not in dispute. The evidence as to this count is as follows: A.S. testified that appellant was at Ms. Willit's house when Ms. Willit was babysitting A.S. At trial, the following colloquy occurred:

Q [prosecuting attorney]: Okay. Do you know why your mom talked to you about good touches and bad touches?

A [A.S.]: Yeah.

Q: Why?

A: Because Tom [appellant] touched me.

Q: Okay. How did it come up?

A: I was playing with my brother.

\*    \*    \*    \*    \*    \*

Q: ... Okay. Would you explain to the jury how your mom found you with [your brother]?

A: I touched him.

Q: Did your mom see that?

A: Yeah.

Q: What did she do when she saw you touch [your brother]?

A: She talked with me.

Q: What did she talk to you about?

A: She said I shouldn't touch nobody.

Q: And what did you tell her?

A: That Tom does it to me.

Q: I'm sorry?

A: Tom does it to me all the time.

A.S. further testified that she took naps at Ms. Willit's house in Ms. Willit and appellant's waterbed. In response to the question, "What did Tom do when you took your nap?", A.S. replied, "He took off his clothes and laid on top of me." She testified that he would "move up and down" on top of her and that "his private area" was touching her legs when he was lying on top of her. After he "moved back and forth" on her, he wiped her off with a towel because "she was wet on her privacy." A.S. stated that appellant often went with her when she took naps.

A.S. testified that she sometimes stayed overnight at Ms. Willit's in the waterbed, but that she did not want to stay overnight when appellant was there because he "touched" her.

Dennis Snodgrass, chief deputy sheriff of Randolph County at the time of the incidents in question, was involved in the investigation of the case at bar. Snodgrass and a juvenile officer, Janice Hall, interviewed A.S. on December 28, 1989. A.S. used dolls to demonstrate what had happened to her. Snodgrass testified that A.S. related to him and the juvenile officer that appellant "had hurt her" and "had rubbed her where he shouldn't have."

A.S.'s mother testified that she first started taking A.S. to Ms. Willit's home for day care in June of 1988. A.S.'s mother first started seeing appellant at Ms. Willit's house in November or December of 1988. A.S.'s mother stopped using Ms. Willit for day care

on December 27, 1989, the evening that A.S. had told her that appellant had been touching her. After bathing A.S. on the evening of December 27th, during which time A.S. complained that her vaginal area hurt, A.S.'s mother found A.S. touching her brother "in the privates" inside his clothing. A.S.'s mother testified that she immediately explained to A.S. that "no one should ever touch anyone in their private areas except a mother when she cleans them," upon which A.S. responded that "Tom does all the time and it hurts and I don't like it." A.S.'s mother immediately examined A.S. and noticed that she was red in the vaginal area. She then called the doctor.

Dr. Vetney examined A.S. with A.S.'s mother present. A.S.'s mother observed that A.S. was much redder internally than she was externally. A.S. told the doctor that "Tom's been touching me down there" and that "it hurts."

We find that the evidence is sufficient to establish appellant's guilt as to Count III, sexual abuse in the first degree. The evidence that appellant "moved up and down" on top of A.S. and that A.S. was wet after appellant did so sufficiently establishes that appellant touched A.S. with the purpose of satisfying his own sexual desire.

As to H.Y. (Count IV), the jury was instructed that it should find appellant guilty of sexual abuse in the first degree if it found that appellant touched the genitals of H.Y., or touched the genitals of H.Y. through the clothing, for the purpose of arousing or gratifying his own sexual desire, and that H.Y. was then less than twelve years old, a fact which is not in dispute.

H.Y.'s father testified that on May 15, 1990, after his wife picked H.Y. up from Ms. Willit's home, he and his wife started getting supper ready while H.Y., who was then three years old, was taking a bath. They heard H.Y. crying in the bathroom, and H.Y.'s father went to check on her. He found her standing in the bathtub and she was shaking and crying. H.Y. said, "it hurts ... where Tom spanked me." H.Y. indicated that Tom "spanked" her in her vaginal area. H.Y.'s parents then took H.Y. to the emergency room.

H.Y.'s mother testified that H.Y. told the doctors that appellant hurt her. H.Y.'s mother stated that, during the doctor's examination, she noticed that H.Y.'s vaginal area was "very red and very raw." Dr. Beil testified that H.Y.'s treating physician stated in his medical report that the interior of H.Y.'s vaginal area was very red and inflamed which is abnormal in a girl that age.

We find that the evidence is sufficient to establish appellant's guilt as to Count IV. The fact that appellant touched H.Y.'s genitals, as the evidence demonstrates, is sufficient to show that he did so for his own sexual gratification, and the jury could reasonably so infer. Thus, we find that the evidence sufficiently establishes appellant's guilt on all counts. The trial court did not err in overruling appellant's Motion for New Trial.

■ Finally, appellant argues that the State invaded the province of the jury and inserted an element of the crime of sexual abuse, touching for the purpose of satisfying or gratifying appellant's sexual desire. Appellant specifically refers to the following colloquy, which occurred during the State's questioning of Janice Hall, a juvenile officer involved in the case at bar:

Q [prosecutor]: *As to the manner in which [A.S.] demonstrated Tom Hendrix placing his genitals between her legs and masturbating himself and getting in that particular detail that she was relating she demonstrated that at the hospital?*

MR. GILMORE [defense counsel]: Well, Your Honor, I'm going to object. One, it's leading; and, two, it's not in evidence; and for that reason I'll ask that this question be stricken. It's never been established in evidence.

MR. FUSSELMAN [prosecutor]: Your Honor—

THE COURT: It could perhaps be inferred but that's up to the jury to do that. I'm going to sustain.

MR. FUSSELMAN: Okay.

MR. GILMORE: I'll ask the jury to disregard.

THE COURT: Jury will disregard (emphasis added).

Appellant argues that despite the court's instruction to disregard, the prosecutor's statement biased and prejudiced the jury and invaded the province of the jury whose responsibility it was to ascertain the facts and make their own inference from the evidence presented. Appellant contends that the court should have declared a mistrial because the prosecutor directly commented on the guilt of appellant. Specifically, appellant argues that but for the prosecutor's improper comment, which went to prove the essential element of touching for the purpose of arousing or gratifying the sexual desire of appellant, the State failed to meet its burden of proving each and every element of the crimes charged.

The declaration of a mistrial is a drastic remedy which is to be exercised only in extraordinary circumstances. *State v. Feltrop*, 803 S.W.2d 1, 9 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). If the drastic remedy of a mistrial is warranted, it is the responsibility of counsel to request that relief. *State v. Mabry*, 602 S.W.2d 1, 2 (Mo.App.1980). Where no such request is made, it is assumed that counsel is satisfied that the corrective action taken by the court is adequate. *Id.* Subsequent complaint that additional corrective measures were needed comes too late. *Id.*

The prosecutor's "statement," about which appellant complains, was in fact a question posed to Ms. Hall. Before Ms. Hall could respond to the question, defense counsel objected and the objection was sustained. The court instructed the jury to disregard the question. Defense counsel did not request a mistrial at that time. Thus, appellant's claim is not preserved for review on appeal because appellant was granted the relief he sought. *Id.; State v. Harvey*, 766 S.W.2d 175, 177 (Mo.App.1989). Furthermore, by the above colloquy, the State did not improperly insert the element of touching for the purpose of gratifying appellant's sexual desire. This element of the crime of sexual abuse was adequately proven by other evidence in the record.[2]

The trial court's judgment is affirmed.

All concur.

2. In the final portion of his brief, appellant asserts the defense of alibi, arguing that there was evidence that appellant was in Oklahoma at the end of December of 1989, around the time of one of the alleged incidents. The jury, however, was free to believe or disbelieve any evidence in the record as to appellant being in Oklahoma at that time, and there was sufficient evidence in the record to refute appellant's alibi defense.